**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

NO. 04-1890
_____

WEIS-BUY SERVICES, INC.;
BRIGOTTA'S PRODUCE & GARDEN CENTER

v.

RALPH PAGLIA, JR.,
in his individual capacity;
AUGUST J. SCOLIO, JR.,
in his individual capacity

August J. Scolio, Jr.,
in his official capacity

<u>Appellant</u>

_____

On Appeal from the United States District Court for the
Western District of Pennsylvania
(Civil No. 00-cv-0121)
District Judge: Honorable Maurice B. Cohill, Jr.
_____

Argued May 3, 2005

BEFORE: McKEE, VAN ANTWERPEN, and WEIS, Circuit Judges

(Filed: June 14, 2005)

Arthur D. Martinucci (Argued)
Kenneth W. Wargo
Quinn Buseck Leemhuis Toohey & Kroto, Inc.
2222 West Grandview Boulevard
Erie, PA 16506

Counsel for Appellant

Michael J. Keaton (Argued)
Keaton & Associates, P.C.
1278 West Northwest Highway
Suite 903
Palatine, IL 60067

Counsel for Appellee

_____

OPINION OF THE COURT
_____

VAN ANTWERPEN, Circuit Judge

  In 1997 and 1998, Appellees Weis-Buy Services, Inc. ("Weis-Buy") and Brigiotta's Produce & Garden Center

2

("Brigiotta's") (collectively "Sellers" or "Appellees") each sold several shipments of fruit to Appellant United Fruit & Produce Company ("United Fruit"), but never received payment.[1] United Fruit filed for bankruptcy on December 9, 1997. On December 29, 1999, the Bankruptcy court authorized a partial distribution of United Fruit's assets to the Sellers. Seeking recoupment of the balance of the money owed to them by United Fruit, Sellers then filed suit on April 26, 2000, against August J. Scolio, Jr., an officer and shareholder of United Fruit, alleging that he had breached his fiduciary duty under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a-499s ("PACA").

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

United Fruit was started by Scolio's father in 1914. Scolio became involved with the company in 1949 and was a partner by 1960. In 1965, Scolio's father died and Scolio became the sole proprietor of the business until 1986, when he sold United Fruit to John Tarantino, Irvin Rovner, and Larry Altman. In 1988, the owners brought in Ralph Paglia to manage the company. Scolio remained an employee of United Fruit, and was responsible for paying bills and calculating the employees' pay.

---

1. Our recitation of the facts is drawn from the opinion of the District Court. See Weis-Buy Servs. v. Paglia, 307 F. Supp. 2d 682, 685-87 (W.D. Pa. 2004)

3

In 1994, Tarantino and Altman sold their shares, leaving ownership of United Fruit in the hands of Paglia (50%), Rover (25%), and Scolio (25%). According to Scolio, he purchased shares for the benefit of Paglia who could not afford to buy all the shares that he wanted. Although Scolio claims that he eventually intended to sell his interest to Paglia, he never did so, and thus Scolio remained a shareholder at the time of United Fruit's bankruptcy.

Not only was Scolio a shareholder and employee of United Fruit, but company policy required his and Paglia's signature for disbursement of United Fruit checks. To assist him in this endeavor, Scolio had a signature stamp created to use when issuing United Fruit's checks.

In June 1997, Paglia asked Scolio to retire, but encouraged him to remain active in the directorship of the company. Scolio ceased working for United Fruit, but retained his stake in the company, his position as officer, and his title as vice-president. Scolio also remained a signatory on United Fruit's bank accounts and United Fruit continued to use Scolio's signature stamp after his retirement. Furthermore, Scolio acted as a guarantor on transactions between United Fruit and Dollar Bank Leasing and possibly First Western Bank.

Soon after Scolio retired, United Fruit began doing business with Weis-Buy and Brigiotta's. From July 9, 1997 through September 23, 1997, Weis-Buy sent five shipments of produce to United Fruit, with payment on each shipment due within ten days. October 3, 1997 was the latest date on which

4

payment was due for any of the Weis-Buy invoices. Brigiotta's provided produce in numerous shipments to United Fruit from August 23, 1997 through February 22, 1998. Again, payments were due within ten days of the date of each invoice, and March 4, 1998 was the latest date on which payment was due on any of the Brigiotta's invoices. Neither Seller received any payment for the produce it provided.

United Fruit filed for bankruptcy under Chapter 11 of the Bankruptcy Code on December 9, 1997. The company ceased operations in March 1998. Sellers' claims were determined to be qualified valid PACA claims by the Bankruptcy Court and each received a partial distribution from United Fruit's remaining assets.

Seeking the rest of the money owed to them, Sellers filed suit against Scolio in the United States District Court for the Western District of Pennsylvania on April 26, 2000. In their complaint, Sellers alleged that Scolio breached his fiduciary duty owed to them under PACA. A bench trial was held on March 19, 2003, and the District Court found Scolio liable and ordered judgment in favor of the Sellers. The District Court also awarded interest and attorneys' fees. Scolio timely appealed.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over this matter

pursuant to 7 U.S.C. § 499e(c)(5)(i)[2] and 28 U.S.C. § 1367. We have jurisdiction over the final decision of the District Court pursuant to 28 U.S.C. § 1291.

We exercise plenary review of the District Court's refusal to dismiss the case on statute of limitations grounds. Lake v. Arnold, 232 F.3d 360, 365 (3d Cir. 2000). We review the award of attorneys' fees and interest for abuse of discretion. In re Rite Aid Corp. Securities Litig., 396 F.3d 294, 299 (3d Cir. 2005); Anthuis v. Colt Indus. Operating Corp., 971 F.2d 999, 1002 (3d Cir. 1992).

### III. ANALYSIS

Scolio raises three issues on appeal. First, he argues that the District Court erred when it failed to dismiss the case on statute of limitations grounds. Second, he claims that the District Court erred in finding him personally liable. Finally, Scolio challenges the District Court's award of attorneys' fees and interest. Because we conclude that Sellers' claims were not timely, we do not address Scolio's other arguments.

---

[2] "The several district courts of the United States are vested with jurisdiction specifically to entertain (i) actions by trust beneficiaries to enforce payment from the trust, and (ii) actions by the Secretary to prevent and restrain dissipation of the trust."

7 U.S.C. § 499e(c)(5).

6

## A. PACA

This Court has had few opportunities to examine PACA, thus we begin by examining the history and purpose of the statute. Congress enacted PACA in 1930 to deter unfair business practices and promote financial responsibility in the perishable agricultural goods market. Sunkist Growers v. Fisher, 104 F.3d 280, 282 (9th Cir. 1997) (quoting Farley and Calfee, Inc. v. United States Dep't of Agric., 941 F.2d 964, 966 (9th Cir. 1991)). "The Act was 'designed primarily for the protection of the producers of perishable agricultural products--most of whom must entrust their products to a buyer or commission merchant who may be thousands of miles away, and depend for their payment upon his business acumen and fair dealing.'" Tom Lange Co. v. Kornblum & Co., 81 F.3d 280, 283 (2d Cir. 1996) (quoting H.R. Rep. No. 84-1196 (1955), *reprinted in* 1956 U.S.C.C.A.N. 3701, 3701).

In 1984 Congress amended PACA to allow for a non-segregated floating trust for the protection of producers and growers. H.R. Rep. No. 98-543 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 406. Congress recognized that these producers and growers tend to be small businesses in a high cost/high risk industry. Id. They generally have capital tied up in land and machinery and their survival depends on timely returns on the sale of their products. Id. Congress explained:

> Many commission merchants, dealers, or brokers, in the normal course of their business

7

transactions, operate on bank loans secured by the inventories, proceeds or assigned receivables from sales of perishable agricultural commodities, giving the lender a secured position in the case of insolvency. Under present law, sellers of fresh fruits and vegetables are unsecured creditors and receive little protection in any suit for recovery of damages where a buyer has failed to make payment as required by the contract.

This legislation would provide a remedy by impressing a trust in favor of the unpaid seller or supplier on the inventories of commodities and products derived therefrom and on the proceeds of sale of such commodities and products in the hands of the commission merchant, dealer or broker in the same manner that has been provided by 'trust' amendments to the Packers and Stockyards Act adopted in 1976. The trust provisions of that act have operated very successfully without imposing a regulatory burden on the industry.

The trust impression by section 5(c)(2) of this act is made up of a firm's commodity related liquid assets, and is a nonsegregated 'floating trust', which permits the commingling of trust assets. In the view of the committee it provides the protection needed by the trust beneficiaries without creating an undue hardship to any person.

> The committee believes that the statutory trust requirements will not be a burden to the lending institutions. They will be known to and considered by prospective lenders in extending credit. The assurance the trust provision gives that raw products will be paid for promptly and that there is a monitoring system provided for under the act will protect the interests of the borrower, the money lender, and the fruit and vegetable industry. Prompt payments should generate trade confidence and new business which yields increased cash and receivables, the prime security factors to the money lender.
>
> These amendments would give the industry and department effective new tools to overcome the payment problems.

Id. at 406-07.  It is clear that Congress intended to create a system by which producers and growers would be secured in their transaction with buyers, and in return they were expected to make prompt claims when the buyers failed to pay.  With this background, we now turn to the claims against Scolio.

### B. Individual Liability

We have not previously decided whether an individual corporate officer can be held liable for breaching his or her fiduciary duty to protect PACA trust assets.  We have guidance from our sister circuits, however, and several have considered this issue and have concluded that individual

9

liability does exist in certain circumstances. See Patterson Frozen Foods v. Crown Foods Int'l, 307 F.3d 666, 669 (7th Cir. 2002) (recognizing that PACA permits recovery against both the corporation and its controlling officers.); Golman-Hayden Co. v. Fresh Source Produce Inc., 217 F.3d 348, 351 (5th Cir. 2000) (holding that shareholders, officers, or directors who control assets may be held liable under PACA.); Sunkist Growers, Inc. v. Fisher, 104 F.3d 280, 283 (9th Cir. 1997) (same).

In Sunkist Growers, 104 F.3d at 283, the Ninth Circuit examined the decisions of several district courts and concluded that "individual shareholders, officers, or directors of a corporation who are in a position to control PACA trust assets, and who breach their fiduciary duty to preserve those assets, may be held personally liable under the Act." In Golman-Hayden, the Fifth Circuit expressed its agreement with Sunkist Growers and further explained:

> PACA is a "tough law". In addition to protecting consumers, Congress expressly designed it to protect the producers of perishable agricultural products, most of whom must entrust their products to a buyer who may be thousands of miles away, and depend for their payment upon his business acumen and fair dealing. An investor in a perishable commodities corporation "should know at the beginning of his association with such a corporation that he is 'buying into' a corporation which is strictly regulated by the federal government through PACA."

10

217 F.3d 348, 351 (internal citations and footnotes omitted).

Individual liability in the PACA context is not derived from the statutory language, but from common law breach of trust principles. Sunkist Growers, 104 F.3d at 282 ("Ordinary principles of trust law apply to trusts created under PACA . . . ."). "Under the common law, the trustee of a trust is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property." Shepard v. K.B. Fruit & Vegetable, 868 F. Supp. 703, 706 (E.D. Pa. 1994). Liability arising from this duty is distinct from the liability that arises when the corporate veil is pierced:

> An individual who is in the position to control the [PACA] trust assets and who does not preserve them for the beneficiaries has breached a fiduciary duty, and is personally liable for that tortious act. This legal framework is to be distinguished from the piercing the veil doctrine, where the corporate form is disregarded because the individual has either committed a fraud, or because the corporation is a "shell" being used by the individual shareholders to advance their own purely personal rather than corporate ends.

Morris Okun, Inc. v. Harry Zimmerman, Inc., 814 F. Supp. 346, 348 (S.D.N.Y. 1993).

We join those circuits that have already addressed this issue and hold that individual officers and shareholders, in certain circumstances, may be held individually liable for breaching their fiduciary duties under PACA. See Patterson Frozen Foods, 307 F.3d at 669; Golman-Hayden Co., 217 F.3d at 351; Hiller Cranberry Prods. v. Koplovsky, 165 F.3d 1, 9 (1st Cir. 1999); Sunkist Growers, Inc., 104 F.3d at 283. That said, before we determine whether Scolio himself was properly held liable here, we must determine whether Sellers brought this action within the applicable statute of limitations period.

### C. Statute of Limitations

The District Court declined to determine whether there was a limitations period applicable to the Sellers' claims, holding instead that the action either did not accrue, or was tolled until December 29, 1999, the date the Bankruptcy court authorized a partial distribution from United Fruit's assets. We believe a more thorough analysis is necessary, and we begin by identifying the appropriate statute of limitations.

"Determining the statute of limitations period for activity governed by a federal statute is a question of federal law." KingVision Pay-Per-View, Corp. v. 898 Belmont, Inc., 366 F.3d 217, 220 (3d Cir. 2004). However, when a federal law provides the basis for the cause of action, but fails to supply a statute of limitations, we must borrow an appropriate statute of limitations from the law of the forum state. Id.; see also North Star Steel Co. v. Thomas, 515 U.S. 29, 34 (1995). We also incorporate relevant state tolling rules. Hardin v.

12

Straub, 490 U.S. 536, 539 (1989); Lake v. Arnold, 232 F.3d 360, 368 (3d Cir. 2000).

Because PACA does not set forth a limitations period for breach of fiduciary duty claims, we look to Pennsylvania law, which provides that such claims must be brought within two years of the date the claim accrues. 42 Pa. C.S.A. § 5524(7);[3] see also In re Mushroom Transp. Co., 382 F.3d 325, 336 (3d Cir. 2004) (recognizing a two-year statute of limitations for breach of fiduciary duty claims); Maillie v. Greater Del. Valley Health Care, Inc., 628 A.2d 528, 532 (Pa. Commw. Ct. 1993) (acknowledging that 42 Pa.C.S. § 5524(7) is the applicable statute for proceedings based upon breach of a fiduciary duty). Therefore, Sellers claims will only be timely if the Sellers brought them within two years of accrual, or if the statute of limitations was tolled.

---

[3] This section prescribes a two-year statute of limitations for:

> Any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter.

42 Pa. C.S.A. § 5524(7).

13

### 1. *Accrual*

Generally, the statute of limitations begins to run on a breach of fiduciary duty claim when the trustee openly and unequivocally violates his duties. Philippi v. Philippe, 115 U.S. 151, 157 (1885) ("[T]he statute of limitations will begin to run from the time such repudiation and claim came to the knowledge of the beneficiary."); United States v. Rose, 346 F.2d 985, 989-990 (3d Cir. 1965) ("The statute of limitations begins to run against the trust beneficiary with respect to a suit against the express trustee, if at all, when he knows the trust has been repudiated or reasonably should have known it."). Applying this reasoning, Scolio argues that the claims against him accrued on the date that the Seller's invoices became overdue. The District Court rejected this rationale, and concluded that because of the continuing nature of the PACA trust, United Fruit's failure to pay the Sellers' invoices amounted to a "continuing violation."

We have previously addressed the contours of the continuing violations doctrine in Cowell v. Palmer Tp., 263 F.3d 286, 293 (3d Cir. 2001). In Cowell, plaintiffs alleged that a township violated their Fourteenth Amendment due process rights by imposing two liens on their properties. Id. at 291. Although the statute of limitations had run since the initial imposition of the liens, the plaintiffs argued that the liens amounted to a continuing violation until they were lifted or expunged. Id. at 293. We disagreed, explaining that "[t]he focus of the continuing violations doctrine is on affirmative acts of the defendants." Id. Adopting the view of the Fourth Circuit, we stated that "'[a] continuing violation is occasioned

14

by continual unlawful acts, not continual ill effects from an original violation.'" Id. (quoting Ocean Acres Ltd. v. Dare County Bd. of Health, 707 F.2d 103, 106 (4th Cir.1983)).

We find that reasoning equally applicable to claims arising from a trust relationship and conclude that once United Fruit and its officers failed to pay Sellers for the good received, Sellers were on notice that the trustees were in breach of their fiduciary duties. Nor are we persuaded that the unique nature of the PACA trust changes our analysis. We recognize that the trust created by PACA exists until a seller is paid, 7 U.S.C. § 499e(c)(2), and "[p]articipants who preserve their rights to benefits . . . remain beneficiaries until they are paid in full," 7 C.F.R. 46.46(c)(2). However, when Sellers are not suing to enforce the trust obligations or to preserve their shares of the trust *res*, but instead are suing the trustee in tort for damages resulting from a breach of his fiduciary duties, we believe that the statute of limitations must accrue from the time that the trustee openly repudiates those duties.[4]

We likewise reject the contention that the claims against Scolio did not accrue until Sellers exhausted their remedies as against United Fruit. Under the District Court's theory, the statute of limitations for bringing PACA claims against Scolio did not accrue until December 29, 1999, because it was only then that the Sellers "were on notice that

---

[4] We emphasize that the statute of limitations applies to actions against the trustee for breach of fiduciary duty.

15

United Fruits's assets were insufficient to satisfy liability." Weis-Buy, 307 F. Supp. 2d at 691. However, Sellers were on notice that the United Fruit's assets may not be sufficient when United Fruit first failed to pay its bills, and at the very least, they were on notice that United Fruit might come up short when it filed for bankruptcy protection in 1997.

Furthermore, because Sellers are suing Scolio in his trustee capacity, it is irrelevant that they did not know whether United Fruit would be able to satisfy Sellers claims. In Donsco, Inc. v. Casper Corp., we explained that:

> [a] corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort. . . . His liability is in no way dependent on a finding that [the corporation] is inadequately capitalized, that the corporation is a mere alter ego of [the officer], that the corporate form is being used to perpetrate a fraud, or that corporate formalities have not been properly complied with. . . . The only crucial predicate to [the officer]'s liability is his participation in the wrongful acts.

587 F.2d 602, 606 (3d Cir. 1978). As Scolio's liability is wholly separate from the corporation's liability, there is no reason to require Sellers to first bring claims against the

corporation before pursuing claims against Scolio.[5] Sellers could have brought suit simultaneously, as the parties did in Golman-Hayden Co., 217 F.3d at 349, or they simply could have sued Scolio directly for breaching his duties.

### 2. *Tolling*

In the alternative, the District Court reasoned that if the claims accrued when the invoices became overdue, "then the

---

[5] Admittedly, some courts have suggested that individual officer liability is determinable only after the plaintiff has shown that the corporate assets are insufficient to satisfy the obligation. For instance, in Golman-Hayden Co., the Fifth Circuit explained:
> PACA liability attaches first to the licensed commission merchant, dealer, or broker of perishable agricultural commodities. If, however, the assets of the licensed commission merchant, dealer, or broker are insufficient to satisfy the PACA liability, then others may be held secondarily liable if they had some role in causing the corporate trustee to commit the breach of trust.

217 F.3d at 351 (footnotes omitted.). We do not read this interpretation of PACA liability to mean that the injured party cannot seek relief from the individual who is secondarily liable until he has a judgment from the corporation that is primarily liable, rather that the seller may only be on notice of the breach of duty after first suing the corporation and discovering that the assets were not preserved.

17

limitations period for bringing PACA claims against Mr. Scolio would have been tolled while Plaintiffs first sought relief from United Fruit. Under this scenario, the tolling period would have ended on December 29, 1999, when Plaintiffs learned that United Fruit's assets were insufficient." Weis-Buy, 307 F. Supp. 2d at 691. Again, we see no justification for tolling the statute of limitations.

"Equitable tolling functions to stop the statute of limitations from running where the claim's accrual date has already passed." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1387 (3d Cir. 1994). Generally, "equitable tolling may be appropriate: (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." Id. None of these situations is present here, and Appellees have offered no justification for tolling the statute of limitations.

As explained *infra*, Sellers were not required to file suit against United Fruit before pursuing an independent action against Scolio. When Sellers were not timely paid, they were on notice that United Fruit, and the responsible parties inside United Fruit, had breached their trustee obligations. At this point the Sellers should have attempted to discover why payment was not forthcoming and who was responsible. Instead, the Sellers sat on their hands, and even after United Fruit filed for Bankruptcy protection in December 1997, they did not file suit. Sellers were under no

18

misapprehension that their money was safe, nor could they assume that no one inside United Fruit was liable for their loss. Consequently, the statute of limitations was not tolled.

## IV. CONCLUSION

Weis-Buy's last invoice came due on October 3, 1997, and Brigiotta's last invoice came due on March 4, 1998. Neither seller filed suit until April 26, 2000, a date plainly later than two years after any of their invoices had come due and more than two years after United Fruit originally filed for bankruptcy. Because we conclude that the statute of limitations had run on these claims before the actions were filed, we need not determine Scolio's individual liability, nor determine whether the award of interest or attorneys' fees were appropriate.[6] Instead, we remand to the District Court for entry of judgment in favor of the Appellant.

---

[6] While we have indicated our agreement that there are circumstances under which officers may be held individually liable for breaching their fiduciary duties arising from a PACA trust, we express no opinion about the correctness of the District Court's conclusion that Scolio's activities were enough to establish individual liability under the facts in this case.